| | | |
|---|---|---|
| CARISSA SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | No. 18-cv-05649 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| VILLAGE OF DOWNERS GROVE, | ) | |
| DAVID FIELDMAN, SHANON | ) | |
| GILLETTE, KURT BLUDER, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In July 2015, Carissa Smith left her patrol officer training program at the Downers Grove Police Department for a one-year active military deployment. She alleges that when she returned to work in July 2016, she was deprived of employment benefits, subject to scheduling difficulties, and held back from advancement—all because of her military service. R. 35, Second Am. Compl.[1] Smith now brings claims against her former employer and supervisors under the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 4301 *et. seq.*, as well as a state-law constructive discharge claim.[2] Defendants have moved for summary judgment. R. 64. For the reasons stated below, the motion is granted.

---

[1]Citation to the docket is "R." followed by the entry number and, when necessary, the relevant page or paragraph number.

[2]The Court has federal question jurisdiction over this case under 28 U.S.C. § 1331. The Court has supplemental jurisdiction over the state-law claim under 28 U.S.C. § 1367.

# I. Background

The facts narrated below are undisputed unless otherwise noted, in which case the evidence is viewed in Smith's favor.[3] In May 2015, Carissa Smith was hired as a police officer for the Downers Grove Police Department. R. 46, DSOF ¶ 11. At this point, she was technically still a recruit. In order to become a permanent member of the Department, she would need to complete a training program and then undergo a one-year probationary period.

The first step for Smith was to go through police academy training. So Smith did that. In June 2015, she successfully completed academy training at the Suburban Law Enforcement Academy. DSOF ¶ 11. After the police academy, Smith returned to Downers Grove to begin working on her next requirement, a Field Training Program (the parties sometimes refer to this as "FTO" training). *Id.* ¶ 7. The FTO program consisted of seven "phases" over 16 weeks and was intended to "provide the essential skills and knowledge for the recruit to perform the daily tasks and responsibilities society demands of the contemporary police officer." *Id.* ¶¶ 6-7.

But Smith did not get to start her FTO training right away. Specifically, at all relevant times in this case, Smith was an active member of the United States Army and was serving in the military reserves. DSOF ¶ 10. When she returned to Downers Grove in June 2015 to begin her FTO training, she learned that she was going to be

---

[3]Citations to the parties' Local Rule 56.1 Statements of Fact are identified as follows: "DSOF" for the Defendants' Statement of Facts [R. 46]; "Pl. Resp. DSOF" for Smith's response to the Defendants' Statement of Facts [R. 53]; "PSOF" for Smith's Statement of Additional Facts [R. 54]; and "Def. Resp. PSOF" for Defendants' response to Smith's Statement of Additional Facts [R. 66]. Smith also filed one addendum fact at R. 59.

deployed for active military duty for one year starting in July 2015. *Id*. ¶ 12. This meant that there would be a gap of roughly three weeks (remember that the FTO program would take 16 weeks) between when she finished her academy training and when she would be deployed for one year. *Id*. ¶ 14.

It is undisputed that, at that point, Deputy Chief Kurt Bluder told Smith that she would not be starting her FTO training because she was going to be deployed in just a few weeks. DSOF ¶ 14. According to Bluder, no matter what she did in the three weeks before she left for deployment, Downers Grove would require Smith to start her FTO over from scratch when she returned from deployment in July 2016. *Id*. Thus, he did not think it would make sense for her to do three weeks of FTO in June 2015, only to have to repeat that training when she returned in July 2016. *Id*.; R. 66, Defs.' Resp. PSOF ¶ 12.

According to the Defendants, Bluder's reasoning was that FTO training involves "perishable skills." DSOF ¶ 15; R. 47-17, DSOF Exh. 19, Bluder Dep. Tr. at 15:7-15. That means each phase of the FTO program built on the previous phase, so to require Smith to remember three weeks of training when she returned from deployment one year later would be a "disservice to her." DSOF ¶ 15. As Smith herself testified, FTO training involves placing new officers with experienced officers in phases, and as each phase moves on, the new officers do more and more work on their own. R. 47-16, DSOF Exh. 18, Smith Dep. Tr. at 28:1-5. Smith of course disputes the opinion that these skills truly are "perishable." R. 60, Pl.'s Resp. Br. at 15-16. Smith's view, as explained in more detail later, was that she could have easily done the first

three weeks of FTO training before she left for deployment, and then simply picked up where she left off when she returned. But the Department insisted otherwise. The three weeks in between when Smith completed her academy training and her deployment did not end up counting toward the completion of Smith's FTO training requirement.

Smith left for her deployment as scheduled in July 2015 and came back in July 2016. DSOF ¶¶ 13, 17. But she did not actually return to work at Downers Grove until September 2016 because of an injury that she suffered during her deployment. *Id.* ¶ 17. That meant Smith did not officially start her FTO training until September 2016. *Id.*

It was not always easy for Smith to juggle her FTO training requirements with her military service. Most importantly, Smith was still required to attend certain military-drill obligations even after her return from deployment, including drill exercises two days every month, as well as an annual two-week military training program. DSOF ¶ 26. These exercises all took place in Indiana. *Id.* The first time her police schedule and military schedule clashed was in December 2016, when she was scheduled for a midnight patrol shift in Downers Grove, which ran from 10:30 p.m. to 6:30 a.m., but was also supposed to report to her military drill in Indiana by 6 a.m. that same morning. *Id.* ¶ 27. Smith testified that she notified Downers Grove's training sergeant and scheduling lieutenant about the scheduling conflict; the training sergeant was Lieutenant Robert McMahon, but Smith does not remember who the scheduling lieutenant was. Smith Dep. Tr. at 35:2-12. According to Smith,

they told her that they would ask the administration, but Smith never got a response. *Id.* at 35:15-18, 36:3-6. So, on the day of what the parties call the "double-back," Smith simply finished her police shift and ended up being late to her military drill; she received a reprimand from the military. DSOF ¶ 27. Fortunately, though, Smith was able to make her January, February, and March 2017 military drills with no issue. *Id.* ¶ 28.

March 2017 is also when Smith finally completed the FTO program. DSOF ¶ 19. The next (and final) phase was for Smith to be released on "solo patrol." *Id.* ¶ 8. This solo-patrol phase was basically a "probationary period" for recruits and would last for one year. *Id.* It is undisputed that the calculation of the one-year period excludes sick leave, leaves of absences, and training time. *Id.* During the probationary period, the recruit would receive periodic performance reviews. *Id.*

So, in March 2017, Smith graduated to solo patrol and officially began her one-year probationary period. DSOF ¶ 19. Shortly after that, in April 2017, Smith was once again assigned to a midnight patrol shift the night before one of her military drills. *Id.* ¶ 29. This time, though, when she notified her supervising lieutenant of the scheduling conflict, the lieutenant let her leave her police patrol at 5 a.m. instead of 6 a.m. to give her enough time to commute to her military drill. *Id.* She made it to the military obligation with no issue. *Id.*

The same thing happened in May 2017; Smith noticed that she was scheduled for a midnight patrol shift the night before one of her 6 a.m. military drills, so she sent an email to Officer Joshua Nelson, who was one of the union stewards. DSOF ¶

30. Smith alerted Nelson to the scheduling conflict between the midnight shifts and her military drills. *Id.* Nelson replied that the Department would be willing to accommodate her schedule, and then Nelson reached out to Deputy Chief William Budds. *Id.* ¶¶ 31-32. Later that day, Budds emailed Smith that he had changed her schedule completely so that she would no longer need to "double-back" to her military drills right after a midnight police shift. *Id.* ¶¶ 33-34. Indeed, it is undisputed that Smith never had any more issues with a midnight shift cutting into her military obligations. *Id.* ¶ 35; R. 53, Pl.'s Resp. DSOF ¶ 35 ("No Dispute that a third double back did not occur").

That being said, the testimony about this issue is confusing. Specifically, Smith testified that, even after the conversation in May, she would still sometimes check her schedule and notice conflicts with her drill weekend, so she would need to proactively remind her lieutenant. Smith Dep. Tr. at 51:4-14. According to Smith, this would happen "every other month." *Id.* at 51:14. Smith also testified that Lieutenant McMahon would give her a hard time about the scheduling accommodations. According to Smith, McMahon (who was presumably the one responsible for addressing her accommodation requests, although it is not clear) would allegedly yell at her and tell her that she "needed to pay closer attention to [her] schedule, and that [she] needed to make sure that [she] gave him … the appropriate notice," even though, according to Smith, McMahon had her "schedule for an entire year." *Id.* at 52:7-16. So, it is not clear whether her schedule was truly fixed in May 2017. Yet, for some reason, Smith does not address that point in her

response to the Defendants' Rule 56.1 statement. *See* Pl.'s Resp. DSOF ¶ 35. It is also not clear how many (if any) double-backs she ended up rescheduling after May 2017. To the extent that she really did see additional double-backs on her schedule going forward, though, she does not dispute that the issue always got fixed after she reminded her lieutenant. Smith Dep. Tr. at 51:15-17.

Something else happened in May 2017. At some point after her double-back issue was ostensibly resolved, Smith suffered a work injury and had to take three months off. DSOF ¶ 20. (Remember that, at this point, she had completed just two months of her one-year probationary period.) She returned to work in August 2017. *Id*. In September 2017, Smith was told by Lieutenant McMahon that she would not be getting credit for her three-month injury leave; that is, instead of finishing her one-year probationary period in March 2018, her probationary period would be "extended due to her time off on workers comp" for three months, to June 2018. *Id*. ¶ 21. According to Smith, McMahon told her that "everybody must complete the whole year of probation," which she did not believe was fair, but she did not challenge him at the time. Smith Dep. Tr. at 65:1-5, 66:24.

At some point in Summer 2017, Smith decided to apply for a job as a firefighter in the City of Joliet. DSOF ¶ 36; Smith Dep. Tr. at 9:4-6. She took the application test, and on March 27, 2018, she was hired for a start date of April 9, 2018. DSOF ¶ 37. So, on the date that she was hired (March 27), Smith emailed Chief Shanon Gillette that she would be resigning from Downers Grove and that her last day would be April 8. *Id*. All seemed well until April 4, when Gillette told Smith that she would

not be getting paid for any of her unused vacation time because she failed to give the Department a full two weeks' notice as required by the collective bargaining agreement. *Id*. ¶ 40.

To provide some background, it is undisputed that the collective bargaining agreement between the Department and the Fraternal Order of Police only provides credit for unused vacation if the resigning employee gave "at least two (2) weeks' notice of resignation or retirement." DSOF ¶ 39. Here, Smith only gave 12 days notice. But according to Smith, she still worked more than 80 *hours* in those 12 days, which adds up to a full two-week work period (under the standard 40 hours per week framework). R. 60-2, Smith Decl. ¶ 36. Because of this disagreement, Smith (through her union) filed at least one grievance challenging the denial of accrued vacation pay. DSOF ¶ 41. At some point, she met with David Fieldman, the Downers Grove Village Manager, and he explained to her that he was denying her grievance. Pl.'s Resp. DSOF ¶ 44. (It is unclear if the grievance Fieldman allegedly denied is the same one that was still pending at the time of the lawsuit's filing. *See* DSOF ¶ 41.)

In the meantime, Smith left Downers Grove and started her new job in Joliet as scheduled. DSOF ¶ 38. (And in fact, she still works for Joliet. *Id*. ¶ 1.) But for the purposes of this case, Smith claims that her decision to leave Downers Grove was not voluntary; rather, she was constructively discharged in violation of both federal and state law. She also claims that when she worked for Downers Grove, she was denied benefits and seniority because of her deployment and that she suffered a number of materially adverse employment actions because of her military service in general.

## II. Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must "view the facts and draw reasonable inferences in the light most favorable to the" non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (cleaned up).[4] The Court "may not weigh conflicting evidence or make credibility determinations," *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (cleaned up), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

---

[4]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

### III. Analysis

At the summary judgment stage, the Court views the evidence in the light most favorable to Smith and gives her the benefit of all reasonable inferences. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### A. USERRA

Smith brings two claims under the Uniformed Services Employment and Reemployment Rights Act (USERRA), 38 U.S.C. § 4301 *et. seq*. In general, USERRA is "intended to protect the employment and reemployment rights of members and former members of the armed forces." *Gross v. PPG Indus., Inc.*, 636 F.3d 884, 888 (7th Cir. 2011). Here, Smith brings a claim for "Constructive Discharge and Retaliation" and a claim for "Other Material Adverse Actions."

Two provisions of USERRA are relevant. First, there is Section 4316, which specifically addresses the rights of servicemembers when they are away from work because of military duties. Under Section 4316, servicemembers are "deemed to be on furlough or leave of absence" when they need to leave their employment for a military obigation, and then when they return to work, they are "entitled to the seniority and other rights and benefits" that they had before they left for service, "plus the additional seniority and rights and benefits" that they would have gotten if they "had remained continuously employed." 38 U.S.C. § 4316. Seniority is in turn defined as "longevity in employment together with any benefits of employment which accrue with, or are determined by, longevity in employment." 38 U.S.C. § 4303(12). The Seventh Circuit has interpreted a seniority benefit to be a "reward for lengthy service,

rather than as compensation for work performed." *DeLee v. City of Plymouth, Ind.*, 773 F.3d 172, 173 (7th Cir. 2014). This interpretation is echoed in the Department of Labor's regulations governing USERRA, which hold that "if an employee who left employment for military service was in the midst of a bona fide … probationary period that required actual training and/or observation in the positions, rather than merely time served in the position, the employee should be allowed to complete the … probationary period following reemployment." 70 Fed. Reg. 75246, 75272, 2005 WL 3451172.

The other relevant USERRA provision is Section 4311, the anti-discrimination mandate. Under Section 4311, servicemembers "shall not be denied … any benefit of employment[5] by an employer on the basis of" of their military service. 38 U.S.C. § 4311(a). Employers are also prohibited from taking "any adverse employment action against any person because such person … has taken an action to enforce a protection" guaranteed by USERRA. *Id*. § 4311(b)(1). The Seventh Circuit has explained that "the same requirement of a materially adverse employment action that applies under other civil rights statutes is applicable under USERRA." *Gross*, 636 F.3d at 892. In other words, Smith "must point to an employment action such as termination, demotion accompanied by a loss of pay, or a material loss of benefits or responsibilities that significantly alters the terms of conditions of [her] employment." *Id*. Under the burden-shifting framework of Section 4311 claims, a plaintiff can

---

[5]A "benefit of employment" is defined as "any advantage, profit, privilege, gain, status, account, or interest (other than wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice and includes … the opportunity to select work hours or location of employment." 38 U.S.C. § 4303(2).

establish a *prima facie* case of discrimination by showing that her service membership was "a motivating factor in the employer's action." *Crews v. City of Mt. Vernon*, 567 F.3d 860, 864 (7th Cir. 2009) (citing 38 U.S.C. § 4311(c)(1)). The employer must then "prove that the action would have been taken in the absence of such membership." *Id.*

Before getting to the substance of Smith's claims, though, there is a threshold statutory issue to sort out. In the Second Amended Complaint (which is the operative complaint), both of Smith's claims are explicitly premised on Section 4316. Yet the actual allegations in her filings go way beyond just a Section 4316 claim; she also appears to include allegations of discrimination based on her military service. But, as outlined above, discrimination is not encompassed in Section 4316. Rather, anti-discrimination is the purview of Section 4311.

The Defendants urge the Court to ignore Smith's discrimination claims because she failed to explicitly list Section 4311 as a legal basis for either of her claims. R. 48, Defs.' Br. at 7. In response, Smith has filed a motion for leave to file a third amended complaint in order to change the legal basis for her two USERRA claims from "Section 4316" to the more-encompassing "Section 4301 *et. seq.*" (which would presumably encompass discrimination claims under Section 4311). R. 61. Defendants, of course, object to this motion. R. 63.

Smith's motion for leave to amend is denied—but only because it is unnecessary. There is no need to explicitly broaden the legal basis for her USERRA claims. Based on the content of Smith's Second Amended Complaint, it is clear that

she intended to advance discrimination claims in addition to her Section 4316 claims, and, based on the deposition transcripts, Defendants were fully able to question her on her discrimination allegations. So, for the sake of completeness, the Court will go ahead and consider the claims under both Section 4311 and Section 4316. But in any case, Smith's claims fail under either provision, as explained further below.

### 1. Other Material Adverse Actions (Count 2)

Turning to the substance of the USERRA claims, the Court will first address Smith's "Other Material Adverse Actions" claim and will then turn to the "Constructive Discharge and Retaliation" claim. With regard to "Other Material Adverse Actions," Smith highlights a number of decisions by her supervisors at Downers Grove that she alleges violated USERRA. These include: (1) the deferral of her FTO training; (2) the refusal to credit her one-year deployment toward her one-year probationary period requirement; (3) the extension of her probationary period by three months when she was injured; (4) the double-back scheduling issues; and (5) the decision to withhold her accrued vacation pay when she resigned. In addition, she also alleges a more general hostile work environment claim under this section. *See* Second Am. Compl. at 11.

### a. FTO Deferral

First, Smith takes issue with the three-week gap between when she finished police academy training and when she left for deployment. According to Smith, she should have been allowed to begin her FTO training at that point and then pick up where she left off when she returned from deployment. Smith contends that she was

not allowed to start the FTO program on time, and then she was denied "credit" for the three-week deferral period after she returned from military deployment. Pl.'s Resp. Br. at 6. To Smith's way of thinking, but for her deployment, she would have finished the FTO program three weeks sooner than she actually did, which would have allowed her to finish her probationary period three weeks sooner than she actually did as well. *Id*. at 7. In her briefing, Smith invokes both Section 4311 and Section 4316. *Id*. at 9.

Taking the Section 4311 discrimination claim first, it is undisputed that Bluder told Smith her FTO training would be deferred because she was leaving for a one-year deployment. DSOF ¶ 14. Even assuming that the deferral of FTO training counts as an adverse employment action, Smith has failed to provide any evidence that Bluder would have made a different decision on deferral if something *other* than military service was the reason why an officer would be leaving for one year.[6] The Defendants, on the other hand, have offered evidence showing that Deputy Chief Bluder believed that the skills taught in the FTO program were "perishable" and that even if Smith started the program for three weeks, she would just have to start the program all over again when she returned from deployment. *Id*. ¶ 15. This particular rationale for deferring FTO training applies to *any* reason for a long leave of absence, not just a military deployment. For instance, there is no evidence that Smith *would*

---

[6]To the extent that Smith frames this decision as a decision to "dock" her three weeks, Pl.'s Resp. Br. at 10, that does not seem accurate. Defendants *deferred* the start of the training program; they did not "dock" three weeks from any calculation of the length of her FTO training. So, the Opinion will treat this decision as a decision to defer the start of her FTO training.

have been allowed to start FTO for three weeks and then pause for a year if she were planning to leave to take care of a sick parent. And indeed, Bluder testified that the Department had previously chosen to defer FTO training for other officers for non-military reasons, including injury. *See* Bluder Dep. Tr. at 25:9-12.

Smith's only response to all of this is that she believes that the perishable-skills argument was a pretext for discrimination. But her only support for that response is her own disagreement with Bluder's testimony. Pl.'s Resp. Br. at 15. Even if Bluder was objectively *incorrect* in believing that the FTO skills were perishable, Smith has offered no evidence to suggest that his belief was not subjectively *genuine*. *See Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 940 (7th Cir. 2003). And even giving Smith the benefit of reasonable inferences, there actually is no evidence in the record that her military service was a special, discriminatory basis for the deferral. Plus, for what it is worth, there is *some* objective basis to conclude that the FTO training skills are time-sensitive. Smith, for instance, testified that the program involved "riding around with experienced officers on different shifts, so that way you can see the different elements of the town at different times." Smith Dep. Tr. at 58:18-21. So, to the extent that the various geographical and temporal elements of Downers Grove are an important part of the training protocol of a Downers Grove officer, then it is not at all farfetched for the Department to require officers to complete the phases of the training program in one go, before they are released on solo patrol. (For similar reasons, Smith's argument about the police academy portion of her training, Pl.'s Resp. Br. at 17, is inapplicable; the academy teaches more general policing skills not

tied to the specific elements of Downers Grove.) But either way, the Department has offered a legitimate, non-discriminatory explanation for the deferral, and Smith has not shown that Bluder did not genuinely believe that explanation. So, the Section 4311 discrimination claim must fail.

Similarly, there is no viable Section 4316 claim here, even viewing the evidence in Smith's favor. Smith argues that she ought to have the three weeks credited against the FTO program time. Pl.'s Resp. Br. at 9. To put it differently, "[w]hen Smith returned from deployment, she was entitled to three weeks shaved off her FTO program." *Id.* at 10. But Smith does not really explain how having three weeks shaved off her FTO program constitutes a seniority benefit. Specifically, Smith has not shown how FTO completion is a "reward for lengthy service," as opposed to "compensation for work performed" *See DeLee*, 773 F.3d at 173.

Here, completion of the FTO program is clearly tied to the work actually *performed*; a recruit does not complete FTO training simply by showing up to work for a certain amount of time. *Compare to DeLee*, 773 F.3d at 181 (longevity pay counted as seniority benefit because "true purpose" was to reward officers for lengthy service, rather than amount of work performed). Rather, the recruit has to successfully undergo several phases of training, observation, and evaluation before they are allowed to "complete" their FTO training. *See* DSOF ¶ 7; Smith Dep. Tr. at 14:13-15. So, the fact that the Department did not "credit" Smith for three weeks of FTO training (that is, reduce her FTO program by three weeks) was not a denial of seniority benefits. Indeed, Smith herself testified: "I understand that, yes, I have to

complete the field training and get that portion complete to show that I have all of the skills and the mind-set to be a police officer." Smith Dep. Tr. at 69:17-22. Smith has failed to provide enough evidence for a reasonable jury to infer that the deferral of her FTO training was a Section 4316 violation.

### b. Probationary Period

Smith makes a similar argument about the one-year probationary period. Specifically, Smith alleges that her one-year deployment should have been credited toward her probationary period requirement. Instead, what happened was that she left for her deployment in 2015, returned in 2016, and was required at that point to *start* her one-year probationary period (after completing her FTO training, to be precise). That meant she was one year behind the other recruits in her class year, who were presumably able to complete their probationary periods when she was serving out her deployment, and who became permanent officers while she remained a probationary recruit. *See* Smith Dep. Tr. at 68:14-24 ("When the people that I got hired with, who were on the same track as me, were well off probation and well on their own career, while I was still stuck in limbo."). According to Smith, she was entitled to that same level of seniority when she returned from her deployment under Section 4316. *Id*. at 69:12-15.

Smith's Section 4316 claim fails for the same fundamental reason as discussed above—the probationary period really has nothing to do with "seniority" at all. For one, the probationary period was not simply a *time*-based status that every recruit automatically "achieved" as long as they remained employed at Downers Grove for

some set amount of time. Rather, new officers were required to complete a variety of different patrols and undergo monthly (and then quarterly) evaluations during their probationary period. Bluder Dep. Tr. at 68:17-21. According to Bluder, the purpose of those evaluations is to assess the recruit "on their ability to perform the job, to ensure that they're retaining the information, that they are applying what they've learned appropriately following laws of Illinois, following our ordinances, et cetera, and all our procedures." *Id*. at 69:6-12. Smith, on the other hand, offers no evidence that the probationary requirement was *not* a bona fide probationary period that required actual training and observations. For the same reasons, Smith's argument that she could have completed her probationary period training *during* her deployment is unconvincing. *See* Smith Dep. Tr. at 77:8-24, 78:1-3 ("I could have been sent documentation to read, videos to look over … because if you think about it, how … is that any different than being a police officer? Me dealing with people, me using certain techniques. If anything, in the military they teach us a lot of the same key components, if not more, than what they teach police officers."). Smith offers no concrete evidence that her military deployment was equivalent to one year in training with the Downers Grove police department, and so there is no way a reasonable jury, even giving Smith the benefit of reasonable inferences, could find that the probation period was not bona fide. There is no Section 4316 claim here.

Similarly, to the extent that Smith is framing this decision as a Section 4311 discrimination claim, she has put forth no evidence that Downers Grove only denied her the one-year probation credit because of her military service. As Defendants point

out, every recruit is required to serve a one-year probationary period. R. 65, Defs.' Reply Br. at 9. And Smith has not offered any evidence showing that Defendants have allowed other *non*-military police officers to advance through their probationary period while on leave or without completing all of the required patrol work. Smith *does* offer testimony (although she does not flesh this out in any of her filings) that she was told by other officers that "the department as a whole had a bad taste in their mouth from another military person that used to work at the department." Smith Dep. Tr. at 79:13-16. That person, according to Smith, "would take long leaves of absence and kind of abuse the system, which is why the department has a lot of pushback to it." *Id*. at 79:22-24, 80:1-2. But the problem is that Smith offers no further evidence about when she heard these statements, who told her the statements, and, most importantly, whether any of the *decisionmakers* in this case made or agreed with those statements. Simply alleging a general "bad taste" within a department is not enough to allow a reasonable jury to infer that Smith's *supervisors* (1) had that same bad taste with regard to military service and (2) acted on that animus when they made the decision to not credit Smith's deployment toward her probationary requirement.

Smith's only other response is that the Defendants have failed to identify any binding caselaw showing that she was *not* entitled to one-year credit toward her probationary period. Pl.'s Resp. Br. at 15. But it is undisputed that Downers Grove does exclude leaves of absences from the calculation of the one-year probationary period. DSOF ¶ 8. And, contrary to Smith's argument that "a military deployment is

not a dockable leave of absence," Pl.'s Resp. Br. at 17, the text of Section 4316 clearly states that "a person who is absent from a position of employment by reason of service in the uniformed services shall be … deemed to be on furlough or *leave of absence* while performing such service." 38 U.S.C. § 4316(b)(1)(A) (emphasis added). Smith does not address this textual argument, nor does she provide any evidence that the Downers Grove definition of "leave of absence" is somehow different from the USERRA definition of "leave of absence." So Smith's claims on the one-year probationary period must fail.

### c. Extension of Probationary Period for Injury

Relatedly, Smith also briefly argues that Defendants improperly extended her probationary period for three months when she could not work for three months due to an injury. Pl.'s Resp. Br. at 17. Remember that Smith had started her one-year probationary period in March 2017, but she was injured in May 2017 and returned to work in August 2017. DSOF ¶ 20. In September 2017, Lieutenant McMahon told Smith that she would not be getting credit for the three months she was off, so instead of finishing her probationary period in March 2018, her probationary period would be "extended due to her time off on workers comp" to June 2018. *Id*. ¶ 21. Smith does not dispute that leaves of absences are properly excluded from the calculation of the one-year probationary period. Pl.'s Resp. Br. at 17. But her argument here is that her injury leave should not have been classified as a "leave of absence," and the only reason the Department did classify it as a leave of absence (and thus extend her probationary period) was because of her military service. Smith Dep. Tr. at 73:5-11.

For the same reasons as explained above, though, this claim fails under both Section 4311 and Section 4316. Smith has failed to show how the decision to classify her injury leave as a leave of absence was motivated by her military service. Her only evidence is that it was part of a "pattern," Smith Dep. Tr. at 73:15, of repeated extensions to her probationary period. Interpreting this argument in the light most favorable to Smith, she seems to be implying that the Department was using any tactic it could to keep her on probation longer, whether that was delaying her FTO training, not crediting her one-year deployment toward her probation, or this current instance, treating her injury as a leave of absence. But, as established above, there is no evidence that the Department either deferred her FTO training or chose not to credit her for her deployment out of any discriminatory animus. So, there is not really a "pattern" to speak of. Zero plus zero plus zero is still zero. And absent anything else, Smith herself testified that the decision to classify her injury leave as a leave of absence—standing alone—"had nothing to do with" her military service. Smith Dep. Tr. at 72:3-5. Similarly, the Section 4316 claim fails for the same reasons articulated in the previous section—Smith has failed to show how the extension of her probationary period constitutes the denial of a seniority benefit.

### d. Double-Back Scheduling

Smith next takes issue with the "double-back" scheduling issue. According to Smith, no matter how many "times [she] provided her military schedule in advance and reminded Downers Grove police officials ad nauseum, they ignored her." Pl.'s Resp. Br. at 20. There are actually two distinct possibilities at play here for what

Smith means by "they ignored her." The first possibility is that Defendants ignored her requests for accommodations. The other possibility is that Defendants ignored the fact that she had existing military obligations by scheduling her for double-backs in the first place. Again, Smith invokes both Sections 4311 and 4316.

Turning to the Section 4311 discrimination claim first, the main problem here is that, even in light of Smith's assertion that Defendants had advance notice of her military drill schedule, there is still no evidence that any of the double-back issues— be it the failure to accommodate or the scheduling of double-backs in the first place— were motivated by her military service.

On the failure to accommodate, there are really only two potential incidents that could form the basis for this argument: (1) the December 2016 double-back where Smith had to attend a full midnight patrol shift and was thus late to her military drill the next morning; and (2) the April 2017 double-back where she was allowed to leave at 5 a.m. but otherwise still had to work the midnight patrol shift. Otherwise, it is undisputed that Defendants accommodated all of Smith's later scheduling conflicts. *See* DSOF ¶ 35; Smith Dep. Tr. at 51:15-17.

Taking the December 2016 incident first, Smith testified that she reached out to Lieutenant McMahon (her training officer), as well as an unnamed scheduling lieutenant, about her scheduling confict. Smith Dep. Tr. at 34:5-12. In response, McMahon and the other lieutenant told her they would check with the administration but then never got back to her. *Id*. at 35:3-6. So, drawing all reasonable inferences in Smith's favor, a jury could conclude that Lieutenant McMahon knew she had a

scheduling conflict in December 2016 but entirely failed to accommodate her. The problem is that even then, Smith still has to prove that that the failure to accommodate was motivated by her military service. And here, she does not offer any such evidence against McMahon.

It is true that Smith does testify that McMahon yelled at her and told her that she "needed to pay closer attention to [her] schedule, and that [she] needed to make sure that [she] gave him … the appropriate notice." Smith Dep. Tr. at 52:7-16. But she never specifies *when* the yelling happened. There is certainly no suggestion that McMahon yelled at her in December 2016, which was the *only* instance where he failed to accommodate her conflict. And Smith has not explained how the content of the yelling (that she needed to pay closer attention to her schedule) was in any way related to her military service. So, even viewing the evidence in Smith's favor, there is not enough evidence for a jury to conclude that McMahon failed to accommodate her December 2016 double-back issue out of any military animus.

Nor is there any evidence linking the other double-back incident with any discriminatory motive. When Smith complained about the April 2017 double-back, Defendants did actually accommodate her military-drill schedule by letting her leave the midnight patrol early. And then, in May 2017, when the previous accommodation was not enough, the Department adjusted her schedule completely so that she would simply not have any more midnight patrols scheduled right before her morning military drills. Indeed, it is undisputed that after May 2017, Smith never had to actually attend another "double-back" midnight patrol shift right before a military

drill. DSOF ¶ 35. Smith does not explain how either of those acts of accommodation were discriminatory or meant that Defendants were ignoring her.

That just leaves Smith's overarching argument that, accommodation or no accommodation, the fact that Defendants scheduled her for shifts that resulted in double-backs in the first place was discriminatory, because it put her in the stressful position of having to constantly monitor her schedule and ask her supervisors for accommodations. According to Smith, she would "have to go to work and then constantly check [her] schedule, to make sure it was changed in the appropriate time; and then on top of that, getting yelled at by [her] lieutenant..." Smith Dep. Tr. at 52:19-24. This was so stressful, argues Smith, that other Downers Grove officers actually decided not to pursue their military careers after seeing what Smith "was dealing with." *Id*. at 80:3-7. That is, Smith experienced "months of … having to fight for" the Department to accommodate her military drill schedule. *Id*. at 80:17-24.

As a threshold matter, though, that it is not entirely clear that the Defendants *did* in fact have advance notice of her military drill schedule. Throughout her filings, Smith cites two pieces of evidence to support her notice allegations: her deposition testimony and her response to one of the Defendants' requests for admission. *See* PSOF ¶ 6 (citing pages 34-37 and pages 50-52 of Smith's deposition transcript); Pl.'s Resp. Br. at 20 ("Pages 50-52 [of Smith's deposition] along with the response to RFA 39 convey the intensity of Smith's efforts and the deaf ears which followed …."). The problem, though, is that the cited evidence does not really line up with her claims. First, her response to Request for Admission ¶ 39 makes no mention of providing

notice of her schedule to Defendants. *See* Exh. 60-3, Pl.'s Resp. RFA ¶ 39. And as for the deposition excerpts she cites, there is only one relevant line, in which she alleges that Lieutenant McMahon "had [her] schedule for an entire year." Smith Dep. Tr. at 52:16. Unfortunately, that assertion is not precise and not placed in context with the actual scheduling of her shift. Specifically, the timing is off because Smith returned from deployment in July 2016, did not start work until September 2016, and then the double-back incident occurred in December 2016. So what does "an entire year" mean? If she is implying that McMahon had her military-drill schedule for "an entire year" before the December 2016 incident, then that would mean he was given the schedule in December 2015, while she was overseas on deployment. But that seems wrong, because Smith testified that she *herself* only had notice of her December 2016 military drill "*two months*" before. *Id.* at 34:17 (emphasis added). And, at most, Smith has alleged that *McMahon* had some notice of her military-drill schedule. But beyond McMahon, Smith provides no detail on when and to whom she provided her military schedule, and she does not offer specifics on how McMahon impacted the scheduling of the midnight shifts.

And even assuming that the Defendants did have advance notice of her military-drill schedule, there is again no evidence that they deliberately scheduled her for double-backs (which they later accommodated when she pointed them out) *because of* some discriminatory motive against military service. The closest Smith comes is her testimony that "the department as a whole had a bad taste in their mouth from another military person that used to work at the department." Smith

Dep. Tr. at 79:13-16. This was the person that "would take long leaves of absence and kind of abuse the system, which is why the department has a lot of pushback to it." *Id*. at 79:22-24, 80:1-2. This sentiment is supported by testimony from Officer Nelson, the union liaison, who noted that there was "locker room talk" and "frustration from the guys" that Smith would go on military leave, which meant she would "short the road and some guys got forced back to work." R. 47-20, DSOF Exh. 22, Nelson Dep. Tr. at 23:17-24, 24:1-7. In essence, there might have been some general resentment among Smith's coworkers about the fact that she was given scheduling accommodations for her military drills (and her longer one-year military leave), which left the other officers to cover her shifts and pick up the slack.

But again, as derogatory as that sort of attitude is toward such an important and admirable form of civic service in our Nation, Smith does not offer enough specifics for this general attitude to count as circumstantial evidence of discrimination. For example, Smith does not provide evidence that any of the *decisionmakers* in charge of her scheduling actually shared any of these alleged views toward military leave. In fact, she does not identify who held those views, how those views were expressed, nor when they were expressed. It would be a different matter, for instance, if there was evidence that the scheduling lieutenant had made comments about how disruptive military drills were and how it was unfair for Smith to shirk her midnight patrol duties, and then the lieutenant scheduled Smith for a series of double-backs right after he made those comments. But Smith provides nothing of that sort. So there is simply not enough evidence for a reasonable jury to conclude that the

Defendants' handling of Smith's military drill schedule was discriminatory in violation of Section 4311.

And, for what it is worth, it is questionable whether the double-back scheduling even constitutes a denial of a "benefit" of employment under Section 4311(a)'s anti-discrimination provision. Specifically, the Seventh Circuit actually analyzed an almost-identical scheduling allegation in *Crews*. There, the police department had *previously* accommodated employee military-drill obligations by allowing officers to "reschedule work shifts that fell on drill weekends." *Crews*, 567 F.3d at 863. Later on, the police department revoked that rescheduling policy. *Id*. The Seventh Circuit held that "[t]he preferential work scheduling policy that the Department previously extended to Guard employees was not a benefit of employment within the meaning of § 4311(a), as this benefit was not one generally available to all employees." *Id*. at 866. So, *Crews* concluded, it was not a USERRA violation for the police department to later revoke the policy. *Id*. Here, too, there is no allegation that the scheduling accommodations Smith was afforded were "generally available to all employees."

For those same reasons, the Section 4316 claim also fails. Smith has not shown that scheduling accommodations are a seniority benefit that she is entitled to under Section 4316. *See* Pl.'s Resp. Br. at 10. And on this point, *Crews* is even more straightforward: "§ 4316(b)(1) … requires only equal benefits for [military] and non-[military] employees," so there is "clearly … no right to special scheduling flexibility." *Crews*, 567 F.3d at 865.

### e. Two Weeks' Notice

The final incident Smith points to is the dispute surrounding the Department's decision to withhold her accrued vacation pay when she resigned from her job in March 2018. Pl.'s Resp. Br. at 13. Here, it is undisputed that the collective bargaining agreement between the Department and the Union requires "two (2) weeks' notice of resignation" in order for an employee to receive accrued vacation pay. DSOF ¶ 39. It is also undisputed that Smith only gave 12 calendar days of notice. From the Department's perspective, that was not enough. From Smith's (and the Union's) perspective, it was. *See* Smith Decl. ¶ 36 (stating that she worked more than 80 hours in those 12 days, which adds up to a two traditional work weeks).

Again, though, there is simply no evidence that the decision was made because of Smith's *military service*. Smith provides no evidence, for instance, that Chief Gillette (who notified Smith that she would not be getting vacation credit) exhibited any animus toward either Smith or her military service. Smith Dep. Tr. at 91:2-5. Similarly, Smith does not allege that Fieldman, the Village Manager who denied her grievance on this issue, exhibited any anti-military-service animus. Most importantly, there is no evidence that the Department singled out Smith when it applied its more-restrictive interpretation of "two weeks."

The only piece of evidence that Smith offers (although she does not address this point in her brief) is her testimony that at around the same time she found out she would not be getting paid her vacation pay, she received a call from Downers Grove Deputy Chief DeVries. Smith Dep. Tr. at 95:7-19. DeVries apparently told her

that the Village was keeping her time because she failed to give the requisite notice, but then "he also continued on to say that I had been nothing but a disturbance at the PD." *Id*. at 96:3-9. Based on this comment about her being a "disturbance," Smith concludes that the decision to withhold her vacation pay was clearly motivated by a discriminatory reason. Yet again, though, the evidence here just does not go far enough. First, there is no evidence that DeVries was even involved in the decision to interpret "two weeks" in such a way as to deny Smith her vacation pay. And even if he were, a single comment about her being a "disturbance" does not establish that the decision was made because of her *military* status. After all, DeVries even started off by explaining that the Village was withholding pay because she failed to provide appropriate notice. Smith has provided no evidence of military-service discrimination to tip the scale toward an inference that Defendants did not genuinely believe the notice rationale. Thus, the Section 4311 claim fails.

There is also no Section 4316 claim. Smith does not explain how the decision to withhold accrued vacation pay based on a dispute over the interpretation of "two weeks notice" has anything to do with her deployment or any other military-leave period. This is not a dispute, for instance, about whether her military leave time should count toward the accrual of vacation time. This is squarely an interpretive dispute about the meaning of a phrase in the collective bargaining agreement. So, to the extent she is bringing a Section 4316 claim on this basis, it must be dismissed.

### f. Hostile Work Environment

Finally, Smith alleges that she was subjected to a hostile work environment because of her military service.[7] In order to state a claim for hostile work environment, Smith must allege that (1) she was subject to unwelcome harassment; (2) the harassment was based on her military service; (3) the harassment was so severe or pervasive that it altered the conditions of employment and created a hostile or abusive working environment; and (4) a basis exists for employer liability. *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 426 (7th Cir. 2004). The Seventh Circuit considers the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Ezell v. Potter*, 400 F.3d 1041, 1047 (7th Cir. 2005).

Here, Smith has not put forth enough evidence to support a hostile work environment claim. To the extent that Smith is premising her hostile work environment claim on any of the individual incidents discussed above, those arguments fail because, as explained above, Smith has not provided any evidence that any of those incidents were remotely based on discrimination against her military service. Smith also argues that "[r]eemploying a returning servicemember in a **less than position**, rather than in the escalator position…represents a hostile work environment and could represent constructive discharge." Pl.'s Resp. Br. at 19

---

[7]It is not clear why Smith included her hostile work environment claim under the "Other Material Adverse Actions" count instead of the "Constructive Discharge and Retaliation" count. But she did, Second Am. Compl. at 11, so the Court will go ahead and analyze the hostile work environment claim in this section.

(emphasis in original). But again, that seems to refer to the decisions to defer her FTO training and to not credit her deployment toward her probationary requirement. Again, neither of those decisions were made because of Smith's military status. Nor has Smith offered any evidence of other instances of harassment. As mentioned above, she does testify vaguely to negative attitudes toward military servicemembers in the Department, *see* Smith Dep. Tr. at 79:10-16, but that generalized allegation does not meet the "severe or pervasive" bar. There is simply not enough detail for a hostile work environment claim to survive.

## 2. Constructive Discharge and Retaliation (Count 1)

### a. Constructive Discharge

A constructive discharge occurs when an employee is forced to resign because her working conditions, from the perspective of a reasonable employee, are unbearable. The Seventh Circuit recognizes two forms of constructive discharge. The first form occurs when an employee resigns due to discriminatory harassment resulting in working conditions "even more egregious than that required for a hostile work environment claim." *Fields v. Bd. of Educ. of City of Chi.*, 928 F.3d 622, 625 (7th Cir. 2019). The second form occurs when an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated. *Id.* Under either theory, the standard is very high: the plaintiff must show that the workplace had become objectively "intolerable." *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 639 (7th Cir. 2009).

Here, a reasonable jury could not find for Smith on either theory of constructive discharge. As explained above, Smith has not even made out a hostile work environment claim, so she certainly has not met the even higher standard for a constructive discharge claim. Smith's evidence, even construed in the most generous light, is simply not detailed enough to establish that she was subjected to egregious harassment based on her military status. The cases where the Seventh Circuit has found an "egregious" work environment usually involve extreme harassment, explicit or implicit threats to personal safety, or both. *See, e.g., Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188, 1198-99 (7th Cir. 1992) (holding that jury could find constructive discharge where plaintiff's boss made constant racist comments and held a pistol to plaintiff's head); *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 789-90 (7th Cir. 2007) (holding that jury could find constructive discharge where plaintiff was sexually harassed and demeaned by her supervisor and her employer failed to respond to repeated complaints). In contrast, the Seventh Circuit has held that mere transfer or demotion is not enough to show an "egregious" work environment; nor are worsened working conditions, loss of employment benefits, or unfair reprimands. *See, e.g., Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 366 (7th Cir. 2009); *Harriston v. Chi. Tribune Co.*, 992 F.2d 697, 705 (7th Cir. 1993) (holding that jury could not find constructive discharge when plaintiff was excluded from office activities, unfairly reprimanded, assigned undesirable sales territory, denied new accounts, barred from supervising two white employees, and refused assistance from her boss). Similarly, merely being reemployed in a "less than position," as Smith claims, would not

constitute constructive discharge. Pl.'s Resp. Br. at 19. Nor is there any evidence that Smith was even given a lesser position when she returned from deployment; as explained above, the fact that her deployment was not credited toward her FTO training or probationary period does not mean she was improperly denied any seniority or seniority benefits. Smith's evidence falls well short of what would be needed to allow a reasonable jury to find constructive discharge based on harassment.

But even beyond that, there is no evidence that a reasonable employee in Smith's position would have believed that termination was imminent. This second form of constructive discharge occurs when "the handwriting was on the wall and the axe was about to fall." *Fischer v. Avanade, Inc.*, 519 F.3d 393, 409 (7th Cir. 2008) (cleaned up). "A person who is told repeatedly that [s]he is not wanted, has no future, and can't count on ever getting another raise would not be acting unreasonably if [s]he decided that to remain with [her] employer would necessarily be inconsistent with even a minimal sense of self-respect, and therefore intolerable." *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 655 (7th Cir. 2000). But in Smith's case, a reasonable jury could not conclude that the "handwriting was on the wall." Smith does not remember receiving any negative evaluations. Smith Dep. Tr. at 124:2-4. Her salary increased by at least $20,000 during her time at Downers Grove. *Id*. at 84:13-17. And she continued to advance through the training program; she successfully completed the FTO program, and she was three months away from completing her probationary period at the time that she left the job.

Even accepting as true Smith's allegation that she was unfairly "yelled at" by Lieutenant McMahon when she asked for scheduling accommodations for her military drills, Pl.'s Resp. Br. at 20, that is not enough to show that a firing was imminent—especially given the fact that McMahon accommodated her requests (with the exception of the original December 2016 double-back, though he did not yell on that instance) and the fact that he never issued any formal reprimands against her. Smith Dep. Tr. at 53:1-14. Indeed, the Seventh Circuit has held that even advanced-stage disciplinary proceedings are not enough to survive summary judgment on a constructive discharge claim. *See Swearnigen-El v. Cook Cty. Sheriff's Dep't.*, 602 F.3d 852, 860 (7th. Cir. 2010) (concluding that employee's suspension with pay was not enough for a reasonable jury to find constructive discharge). And even if Smith was somewhere on the road to termination, the mere possibility of eventual termination is not enough to establish constructive discharge. *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010) ("[A] working condition does not become intolerable or unbearable merely because a prospect of discharge lurks in the background.") (cleaned up).

For these reasons, Smith has failed to provide enough evidence for a reasonable jury to find constructive discharge in this case.

### b. Retaliation

Similarly, to the extent that Smith is pursuing a retaliation claim, that, too, fails. In order to establish a retaliation claim, she must demonstrate that (1) she engaged in activity protected under USERRA and (2) Downers Grove took an adverse

employment action against her as a result. *Gross*, 636 F.3d at 892. Here, Smith does not really flesh out this claim in any of her filings. For instance, Smith does not explicitly identify how she engaged in a protected activity. Same thing with the adverse employment action requirement. *See* Pl.'s Resp. Br. at 5 ("Plaintiff's lawsuit … is characterized by several complaints (incidents), for which Plaintiff avers…are products of … retaliation."). To the extent that Smith is relying on the conduct complained of above (for instance, the FTO deferral, not getting credit toward her one-year probationary period, the double-back scheduling issues, and so on), she has not shown how any of those decisions constitutes an adverse employment action for purposes of her retaliation claim. *See Cole v. Illinois*, 562 F.3d 812, 816-17 (7th Cir. 2009) ("[N]ot everything that makes an employee unhappy is an actionable adverse action.") (cleaned up). The retaliation claim fails.

## C. State Law Constructive Discharge

Finally, Smith asserts a constructive discharge claim under Illinois common law. But both federal claims have been dismissed, and "when the federal claims are dismissed before trial, there is a presumption that the court will relinquish jurisdiction over any remaining state law claims." *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 631 (7th Cir. 2016) (*per curiam*) (citing cases). Indeed, this presumption is statutorily expressed in 28 U.S.C. § 1367(c)(3), which provides for the discretionary relinquishment of jurisdiction over state claims when the claims providing original jurisdiction (here, federal-question jurisdiction) have been dismissed. The Defendants ask the Court to go ahead and grant summary judgment

on the state claim too, Defs.' Br. at 15, but Smith urges the Court to relinquish jurisdiction so that she can pursue her claim in state court instead, Pl.'s Resp. Br. at 20. In light of the usual presumption, and no particular legal or factual expertise on this constructive-discharge claim, the Court will relinquish supplemental jurisdiction over the state claim, and Smith may try her hand in state court. The state claim is dismissed without prejudice to refiling in state court.

## IV. Conclusion

For the reasons stated above, the motion for summary judgment is granted. The status hearing of April 9, 2020 is vacated, and the Court will enter final judgment.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 26, 2020